UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONY HADDAD,                                          Case No. 09-12597

        Plaintiff,                          David M. Lawson
vs.                                                   United States District Judge

CHARLES RILEY & ASSOCIATES, INC.,                     Michael Hluchaniuk
CHARLES RILEY, BRIGHTON                               United States Magistrate Judge
MARKET, INC., and BLUE DIAMOND
MARKET OF WARREN, INC.,

        Defendants.
and

BRIGHTON MARKET, INC.,

        Cross-Claimant,
vs.

CHARLES RILEY & ASSOCIATES, INC.,

        Cross-Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS MOTIONS FOR SUMMARY JUDGMENT (Dkt. 30, 39)**

## I.     STATEMENT OF FACTS

Plaintiff filed the present cause of action on July 2, 2009, claiming that

defendants Charles Riley and Associates, Inc., Charles Riley (collectively, Riley),

Blue Diamond Market of Warren (Blue Diamond), and Brighton Market, Inc.

(Brighton Market) violated his rights under the Fair Credit Reporting Act relating

to collection efforts that were undertaken by defendants regarding bad checks that were cashed in the Blue Diamond and the Brighton Market and subsequently assigned to Riley for collection from plaintiff. (Dkt. 1). Previously, the undersigned recommended that the Court grant Brighton Market's motion for default judgment based on the default previously entered against Riley that Riley's motion to set aside default be denied, and that judgment be entered against Riley in favor of Brighton Market on its cross claim. (Dkt. 42, 43). These recommendations were adopted by the District Court on February 10, 2010. (Dkt. 47, 48).

On December 8, 2009, plaintiff filed a motion for summary judgment against all defendants. (Dkt. 30). Riley and Brighton Market filed responses on January 5, 2010. (Dkt. 36, 37). Brighton Market filed a cross-motion for summary judgment on January 5, 2010, seeking judgment in its favor on all of plaintiff's claims. (Dkt. 39). On January 29, 2010, plaintiff filed a response and on February 12, 2010, Brighton Market filed a reply. (Dkt. 45, 49).

On March 3, 2010, the Court held a telephonic hearing on both motions. At the conclusion of the hearing, plaintiff's counsel was directed to send a letter to counsel for Brighton Market, setting forth the new authority cited at the hearing. Brighton Market was permitted to file a supplemental brief addressing the new authority relied on by plaintiff, which was filed on March 17, 2010. (Dkt. 52).

This matter is now ready for report and recommendation

For the reasons set forth below, the undersigned **RECOMMENDS** that

plaintiff's motion for summary judgment against the Riley defendants be

**GRANTED IN PART** and **DENIED IN PART**, and that the cross motions for

summary judgment submitted by plaintiff and Brighton Market against each other

be **DENIED**.

## II.     STATEMENT OF FACTS

The pertinent facts are not in dispute.  On October 11, 2005, Blue Diamond

cashed a check that was purportedly made by Rock Financial and payable to Tony

Haddad.  (Dkt. 30, Ex. 1) (Blue Diamond check).  While the plaintiff's name is

Tony Haddad, he claims that he had nothing to do with this check.  (Dkt. 30-10,

pp. 141-142).  The Blue Diamond check was deposited by Blue Diamond into its

bank account at Huntington National Bank and was later returned to it by its bank

with the words "NO ACCOUNT ON FILE" stamped across the bottom.  (Dkt. 30,

Ex. 1).  Six weeks later on November 23, 2005, Brighton Market cashed a check

that was purportedly made by Wireless Toyz and payable to Tony Haddad (Dkt.

30, Ex. 3) (Brighton Market check).  Again, plaintiff claims that he had nothing to

do with this check.  (Dkt. 30-10, pp. 141-142).  This check was deposited by

Brighton Market into its bank account at Bank One and was also later returned to

Brighton Market by its bank with the words "NO ACCOUNT ON FILE" stamped

across the bottom.  (Dkt. 30, Ex. 3).

Charles Riley and Associates is a collection agency owned by Charles Riley. Together, the Riley defendants collect debts.  (Dkt. 30-11, p. 24).  Riley was hired by Brighton Market on April 27, 2007 to collect the Brighton Market check, pursuant to a written contract.  (Dkt. 30, Ex. 5).  Riley was also hired by Blue Diamond in October, 2005[1] to collect the Blue Diamond check.  On June 26, 2007, Riley apparently compared the Blue Diamond check with the Brighton Market check, noticing a connection between these checks.  (Dkt. 30-11, pp. 74-76). Specifically, Riley noticed that both checks were made payable to Tony Haddad, both checks had the same street address under the name "Tony Haddad" but in different cities, and the signature of the maker of each check was "similar."  (Dkt. 30-11, pp. 73, 75, 77).  At this time, Riley knew that both addresses under the name "Tony Haddad" on each check were non-existent as he had previously sent demand letters to the Tony Haddad listed at each address on the bogus checks. Both of these letters were returned by the post office as nonexistent addresses. (Dkt. 30-11, pp. 76-77).

According to plaintiff, given Riley's knowledge that much of the

---

[1]  According to plaintiff's brief, Riley was hired by Blue Diamond in October, 2007.  This appears to be a typographical error as Riley states in his response to the motion for summary judgment that he received the Blue Diamond check and sent out the first validation letter (to the fake address) in October, 2005. (Dkt. 36).

information on the checks was false, it was unreasonable for him to assume that the person would wrote the bad checks used his real name. Plaintiff suggests that because Riley has collected in excess of 20,000 checks in his life time (Dkt. 30-11, p. 48), his belief that whoever created and passed these bad checks still used his real name of Tony Haddad was not likely or reasonable. Using the White pages, a free website that allows one to find a person's home address, Riley located plaintiff in this case and proceeded with attempts to collect the debts at issue. (Dkt. 30-11, p. 26). On May 22, 2009, Riley sent two demand letters to the plaintiff, at his home address. (Dkt. 30-6, 30-7). Each letter accused plaintiff of passing bad checks. *Id*. The demand letters are identical except for name of the Riley's clients. According to plaintiff, after receiving these letters, he called Riley and informed him that he was not the person who had passed these checks. Riley asked plaintiff for his social security number and he refused. Instead, plaintiff asked Riley to produce the last four digits of the person's social security number that Riley was looking for and plaintiff would either confirm or deny whether those digits were part of his social security number. Riley refused. Riley then told plaintiff that he would have the case "set for trial next week" and hung up on plaintiff. (Dkt. 30-11, pp. 130-131). Riley admitted, however, that he did not actually have plaintiff's social security number during this conversation. Rather, Riley later obtained this number from the consumer dispute verification form forwarded to Riley by

Experian.  (Dkt. 30-11, p. 154).  Riley placed a "trade line"[2] on plaintiff's credit file with Experian; one for each of the checks that Riley was attempting to collect. (Dkt. 30, Ex. 8, pp. 1-2).

Plaintiff learned about these trade lines on May 24, 2009 and submitted a consumer dispute to each of them.  (Dkt. 30, Ex. 9).  According to plaintiff, he has never had any collection items or judgments on his credit report prior to the bogus trade lines placed by Riley.  (Dkt. 30-10, pp. 35, 42).  On receipt of plaintiff's consumer dispute, Experian forwarded plaintiff's consumer dispute to Riley via a Consumer Dispute Verification form.  (Dkt. 30, Ex. 9).  Riley then reported plaintiff's consumer disputes to both Brighton Market and Blue Diamond.  (Dkt. 30-11, p. 104).  Brighton Market took no action in response to the plaintiff's consumer dispute because its agent, Jeff Farida, testified that he was unaware that Brighton Market had placed a trade line on plaintiff's consumer credit file.  (Dkt. 30, Ex. 10, pp. 27).  According to plaintiff, in response to the consumer dispute, Riley "merely perused [the] same file that contained no identifying information on Mr. Haddad other than the bogus check that contained his name as payee."  In response to the consumer disputes to the trade lines placed on his consumer credit file by Riley, both Brighton Market and Blue Diamond verified their respective trade lines through Riley.  (Dkt. 30-11, p. 135).  Riley admitted that at the time that

---

[2] A trade line is an account listed on a credit report.  Each separate account constitutes a different trade line.

he was supposed to have conducted a reinvestigation into the plaintiff's consumer dispute, he did not have plaintiff's social security number. (Dkt. 30-11, pp. 153-154). Riley also admitted they do not know if it was actually plaintiff who had passed the bad checks. (Dkt. 30-11, p. 128). According to plaintiff, Riley unlawfully "confirmed" both trade lines on behalf of Blue Diamond and Brighton Market despite the lack of information plaintiff had any involvement with the bogus checks. Mr. Riley admitted that defendants verified their trade lines on plaintiff's consumer credit file because plaintiff "did NOT prove that he was NOT the bad actor." (Dkt. 30-11, p. 135; Dkt. 30-9, answer 10).

## III.    ANALYSIS AND CONCLUSIONS

### A.    Standard of Review

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the evidence and all reasonable inferences must be construed in favor of the nonmoving party. *Tanner v. County of Lenawee*, 452 F.3d 472, 477 (6th Cir. 2006). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (citation omitted). Moreover, affidavits must meet certain requirements:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1). In accordance with Rule 56(e), the Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir. 1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *Id.*, unsworn statements, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-969 (6th Cir. 1991), inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222, 225-226 (6th Cir. 1994). Thus, "[a] party opposing a motion for summary

judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Id*., quoting, *Sperle v. Michigan Dept. of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002) (citation and quotation marks omitted). "In deciding a motion for summary judgment, [the] court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

B.    Fair Debt Collection Practices Act

Plaintiff claims that the Riley demand letters and his statement over the telephone that he would "set the case for trial next week" both violated the FDCPA. Plaintiff makes this claim against Riley only and does not claim that Brighton Market is vicariously liable for Riley's actions. Riley has opposed plaintiff's motion.

1.    Claimed Violations of § 1692e

According to plaintiff, Riley knew or should have known that plaintiff was not the person who delivered the bad checks for which they were attempting to collect. In their demand letters to plaintiff, Riley demanded payment from the plaintiff even though he owed nothing to Riley's clients. Riley also directly accused plaintiff of writing checks that had been returned as unpaid. These statements are patently false in violation of 15 U.S.C. § 1692e of the FDCPA, which prohibits false, deceptive and misleading representations in connection with

the collection of the bogus checks. Plaintiff also asserts that Riley violated the

FDCPA by using the following language in the demand letters:

> Our office may also consult with our client as to whether
> or not to turn this over to the local police department for
> possible further action to be taken against you.

(Dkt. 30, Exs. 6, 7). According to plaintiff, this statement violates the § 1692e of

the FDCPA because plaintiff had not done anything unlawful. That is, Riley had

no basis for accusing him of breaking the law and threatening him with criminal

prosecution. Using the least sophisticated consumer standard, according to

plaintiff, Riley erroneously communicated that he was or may be subject to

prosecution when in fact, this was never the case. In his deposition, Mr. Riley

admitted that he told plaintiff that he would have the case "set for trial next week"

since he found plaintiff to be uncooperative in sharing his social security number.

15 U.S.C. § 1692e(5) prohibits a debt collector from threatening to take any action

that cannot legally be taken or that is not intended to be taken.

In response, Riley points to *Harvey v. Great Seneca Financial Corp.*, 453

F.3d 324, 329 (6th Cir. 2006) in which the Sixth Circuit rejected the claimed

violation of §§ 1692d and e(10) based on the filing of a collection suit without

adequate proof at the time of filing. With respect to § 1692(d), the Court observed

that the activities prohibited by this provision (such as violent threats, the use of

obscene language, and repeated phone calls) are those "tactics intended to

embarrass, upset, or frighten a debtor." *Harvey*, 453 F.3d at 330, citing 15 U.S.C.

§ 1692d(1) -(6). The Court concluded that "[t]hese tactics are not comparable to

the single filing of a debt-collection lawsuit." Rather, from the perspective of an

unsophisticated consumer, the filing of a debt-collection lawsuit without the

immediate means of proving the debt does not have the natural consequence of

harassing, abusing, or oppressing a debtor or a violation of the FDCPA. *Id.* at

330-31. The Sixth Circuit also rejected the plaintiff's theory that filing a collection

action without the immediate means of proving the debt equaled a deceptive

practice under 15 U.S.C. § 1692e(10). *Harvey*, 453 F.3d at 331- 333. The Sixth

Circuit noted that a person filing suit does not tacitly represent that he has the proof

on hand to validate the debt. The Sixth Circuit concluded that a debt may be

properly pursued in court, even if the debt collector does not yet possess adequate

proof of its claim, under Federal Rule of Civil Procedure 11. *Id.* at 333. Based on

*Harvey*, Riley asserts that no valid FDCPA claim could arise from sending plaintiff

two separate demand letters, which indicated that there were "two checks made out

by someone without authority to do so and wrongly cashed by someone using

'Tony Haddad' as a means to obtain cash from the payors under false pretenses."

Further, Riley argues that they had reason to believe that plaintiff may have

issued these checks and obtained money from cashing them. Riley also disputes

plaintiff's claim that they accused plaintiff of breaking the law and threatened

plaintiff with criminal prosecution. According to Riley, the letters merely contain a statement that Riley would consult with their clients about other action. Riley argues that plaintiff's conclusion that he would not be subject to any criminal prosecution is self-serving because only the prosecuting attorney can make such a determination.

The FDCPA seeks to protect consumers from abusive, deceptive and unfair debt collection practices by establishing, in part, guidelines for communications by debt collectors. A *prima facie* case for violation of the FDCPA requires plaintiff to show three elements: (1) the plaintiff is a "consumer" within the meaning of the statute; (2) the defendant collecting the debt is a "debt collector" within the meaning of the statute; (3) the defendant has violated by act or omission a provision of the FDCPA. The first two elements do not appear to be at issue. This Circuit uses the "least sophisticated consumer" test in evaluating the third element. *Federal Home Loan Mort. Corp. v. Lamar*, 503 F.3d 504, 509 (6th Cir. 2007). "The least sophisticated debtor standard is lower than simply examining whether particular language would deceive or mislead a reasonable debtor." *Id.*, quoting, *Smith v. Computer Credit, Inc.*, 167 F.3d 1052, 1054 (6th cir. 1999) (internal punctuation and citation omitted). "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." *Id.*, quoting, *Clomon v. Jackson*,

988 F.2d 1314, 1318 (2d Cir. 1993). "[A]lthough this standard protects naive

consumers, it also prevents liability for bizarre or idiosyncratic interpretations of

collection notices by preserving a quotient of reasonableness and presuming a

basic level of understanding and willingness to read with care." *Id.* at 509-510,

quoting, *Wilson v. Quadramed Corp.*, 225 F.3d 350, 354-55 (3d Cir. 2000)

(internal quotation marks and citation omitted).

Section 1692e generally prohibits the use of "false, deceptive, or misleading

representation or means in connection with the collection of any debt." 15 U.S.C. §

1692e. Specifically at issue here are § 1692e(5), which proscribes "[t]he threat to

take any action that cannot legally be taken or that is not intended to be taken," and

§ 1692e(10), which similarly prohibits "[t]he use of any false representation or

deceptive means to collect or attempt to collect any debt...." 15 U.S.C. § 1692e.

In addition to the required notice that the letter was an attempt to collect a

debt and that it was a communication sent by a collection agency, the collection

letters at issue in this case provide as follows:

> This letter informs you regarding the language of the
> Mich. Stat. 600.2952 BAD CHECK LAW EFFECTIVE
> JANUARY 1, 1999 dealing with dishonored checks. A
> check, draft, or order of payment of money drawn by you
> was returned unpaid.
>
> This notice is a formal demand for payment of the full
> amount of the dishonored check(s) plus applicable fees
> and fines for a total of $513.25. If you pay this total
> amount within 7 days, excluding weekends and holidays,

after the date this notice was mailed, no further civil action will be taken against you. Our office may also consult with our client as to whether or not to turn this over to the local police department for possible further action to be taken against you.

If you do not resolve the amount that is owed, our office will advise our client that they will be authorized by state law to bring a civil action against you to determine your legal responsibility for payment of the amount due.

(3) The maker of a dishonored check, draft, or order for payment of money is liable to the payee as provided in subsection (4) if the maker f ails to pay one (1) of the following in cash to the payee or a designated agent of the payee after the mailing of a written demand for payment pursuant to subsection (2): (a) Within 7 days, excluding weekends and holidays, after the written demand provided in subsection (2) is mailed, the full amount of the dishonored check(s) draft, or order, plus applicable processing fees. (4) Except as otherwise provided in subsection (5), a maker who fails to make payment pursuant to subsection (3) and who is found responsible for payment in civil action is liable to the payee for payment of all of the following: (a) The full amount of the check, draft, or order. (b) Civil damages of 2 times the amount of the dishonored check, draft, or order or $100.00, whichever is greater. (c) Cost of $250.00. (5) Subsection (4) does not apply if, before the trial of an action brought pursuant to this section, the maker pays to the payee or designated agent of the payee, in cash, the total of the amount described in subsection (3)(b), plus reasonable costs, not exceeding $250.00, as agreed to by the parties. (6) An action under this section may be brought in the small claims division of the district court, if it does not exceed the jurisdiction of the small claims division, or in any other appropriate court. If the amount of the check exceeds the jurisdiction of the small claims division, the action may still be brought in the small claims division, but the amount of the damages

awarded shall not exceed the jurisdiction of the small
claims division.

Immediate action needs to be taken to resolve this debt.
Due to the nature of this debt, payment in the amount of
$513.25 is due. Cash payment in our office, a Cashier's
Check, or Money Order is the only acceptable payment
terms.

(Dkt. 30-6, 30-7). The undersigned suggests that under pertinent case law, there

are questions of fact as to whether Riley, in the foregoing collection letter, violated

the FDCPA. In *United States of America v. National Financial Services, Inc.*, 98

F.3d 131 (4th Cir. 1996), the Court examined whether the statements "Your

account will be transferred to an attorney if it unpaid after the deadline date" and

"remember your attorney will want to be paid" constituted a threat of legal action

that was not intended to be taken. The trial court found that the debt collector had

no intention of taking such action. On appeal, the defendant argued that the

language at issue did not threaten legal action because it did not state that legal

action "will be" filed or "is going to be" filed and because it was true that if a

debtor was sued, he or she would incur legal fees. Rather, according to the

defendant, all of their statements were "open to interpretation." The Fourth Circuit

rejected the defendant's position and held that "[w]hile defendants are literally

correct, we do not believe that any consumer could reasonably believe that NFS

intended to provide a public service by information about the basic functions and

fee requirements of attorneys." *Id.* at 137. The court also found that the threat to

"consider" suing, if untrue, violated the FDCPA. *Id.* The Fourth Circuit

expounded on the basis for its conclusions by rejected the "hyper-literal" approach

advocated by the defendant:

> With these arguments, the defendants ask this court to
> adopt a hyper-literal approach which ignores the ordinary
> connotations and implications of language as it is used in
> the real world. We decline to do so. We concur with the
> district court's analysis of the notices, and conclude that
> the defendants' notices threatened to take legal action
> which they had no intention of taking, in violation of §
> 1692e(5). No reasonable juror could conclude that those
> statements were not meant to make debtors fear that they
> would be sued. To find otherwise would undermine the
> consumer protection goals of the statute and permit debt
> collectors to get away with accomplishing the threat
> under the flimsy disguise of "statements of fact." As we
> have said before in the context of § 1692g, "[t]here are
> numerous and ingenious ways of circumventing [the law]
> under a cover of technical compliance. [The defendants
> have] devised one such way, and we think that to uphold
> it would strip the statute of its meaning." *Miller v.
> Payco-General American Credits, Inc.*, 943 F.2d 482,
> 485 (4th Cir. 1991). Here, we have an obvious intention
> to make debtors afraid that they would be sued, an
> effective tactic no doubt, but one which violates the law.

Relying on *National Financial Services*, an Illinois District Court similarly

concluded that, while the collection notice at issue provided an "accurate summary

of the law" by stating that "Various Penal Codes allow for criminal prosecution

when a person knowingly writes a bad check(s)," the "obvious intention was to

threaten referral" for criminal prosecution. *Davis v. Commercial Check Control,

Inc.*, 1999 WL 89556, *6 (N.D. Ill 1999). Relying on the FTC Official Staff

Commentary on the Fair Debt Collection Practices Act, 53 Fed.Reg. 50097 (Dec. 13, 1988), which states that "[a] debt collector may state that certain action is possible, if it is true that such action is legal and is frequently taken by the collector or creditor with respect to certain debts ... .", the *Davis* court concluded that the threat was false because the defendant failed to show that referral for criminal prosecution was an action "frequently taken." *Id*. at *7. The court reached a similar conclusion in *Gradisher v. Check Enforcement Unit*, *Inc.*, 210 F.Supp.2d 907, 917 (W.D. Mich. 2002), in which the "just stating the facts" defense was rejected where there was no "particularized intention" to refer the debtor for criminal prosecution, the collection agency had no authority to determine if the debtor had violated the law, and it had no way to determine if a criminal prosecution was "even remotely possible."

Unfortunately, neither party in this case cited or addressed the above-referenced cases. While none are binding authority on this Court, the *National Financial Services* case has been relied on by the Sixth Circuit, albeit under a different factual scenario. *See Federal Home Loan Mortgage Corp. v. Lamar*, 503 F.3d 504, 510 (6th Cir. 2007). In addition, district courts within this circuit, including this one, have followed the *National Financial Services* model, which the undersigned suggests is based on the plain language of the statutory provision at issue. *See Lovelace v. Stephens & Michaels Associates*, *Inc.*, 2007 WL 3333019

(E.D. Mich. 2007) (Threat to sue may be fairly implied where collection letter states that an attorney will effect a "resolution"); *Lamb v. M&M Associates, Inc.*, 1998 WL 34288694 (S.D. Ohio 1998); *Smith v. Transworld Systems, Inc.*, 1997 WL 1774879 (S.D. Ohio 1997) (Collection notice violated § 1692e(5) if the least sophisticated consumer would reasonably believe that the letter threatens legal action and the debt collector does not intend to take such action).

In the view of the undersigned, Riley's position that because a debt collector can file suit on a claim not barred by the statute of limitations without violating the FDCPA (as set forth in *Harvey*, *supra*) does not mean that a debt collector cannot otherwise violate the FDCPA for threatening to take legal action without intending to do so. Such an interpretation would essentially gut the language of § 1692e(5) and there is no basis for doing so. However, the undersigned further suggests that the collection letter at issue is subject to varying interpretations and should be presented to a jury to determine whether §§ 1692e(5) and e(10) have been violated.

As to Riley's statement that he would have the matter "set for trial next week," the undersigned suggests that there is no other possible interpretation of this statement to plaintiff other than a "threat to take any action that cannot legally be taken or that is not intended to be taken," and a "false representation or deceptive means to collect or attempt to collect any debt...." 15 U.S.C. § 1692e(5),

(10).  The undersigned suggests that plaintiff's motion for summary judgment in this regard be granted.

### 2. Bona Fide Error Defense

Riley also relies on the "bona fide error" defense found in 15 U.S.C. § 1692k(c).  This section provides that a debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.  15 U.S.C. § 1692k(c).  According to Riley, they reasonably believed that the Tony Haddad with whom they were dealing was the Tony Haddad who allegedly cashed the two bogus checks in question.  Riley suggests that this is confirmed by his affidavit and the exhibits showing the chronology of the efforts by Riley to contact plaintiff and to verify the debt in question.  Riley argues that, to the extent that there was any "accusation," that statement does not substantiate any violation of the FDCPA where Riley was accumulating information about the person named "Tony Haddad" and where plaintiff was uncooperative and antagonistic in dealing with Riley about the debt. Riley asserts that the fact that they may have been wrong is not a violation of the FDCPA where they were acting reasonably and with good faith.

The FDCPA, including § 1692c(b), is a strict liability statute and therefore

does not require a showing of intentional conduct on the part of a debt collector to give rise to liability. *Lovelace*, at *3, citing, *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996). However, the FDCPA includes an affirmative defense where a debt collector may avoid liability if it "shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). "The debt collector must only show that the violation was unintentional, not that the communication itself was unintentional." *Lovelace*, at *3, citing, *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). As to the suggested violation above (the verbal threat to set the matter for "trial next week"), there is no evidence in the record suggesting that Riley did not intend to threaten plaintiff with trial, which Riley knew was false at the time he said it, and knew he did not (and could not) take such action. Thus, the undersigned fails to see how this violation is subject to the "bona fide error" defense. As to the FDCPA claims on which the undersigned suggests there are genuine issues of material fact, the undersigned suggests that nothing would preclude Riley from asserting this defense before a jury.

    C.    <u>Fair Credit Reporting Act</u>

The FCRA imposes a duty on furnishers of credit information to report accurate information to consumer reporting agencies regarding a consumer's

credit, although there is no private cause of action for such a violation. *Bach v.*

*First Union Nat. Bank*, 149 Fed.Appx. 354, 358 (6th Cir. 2005), citing, 15 U.S.C. §

1681s-2(a)(1)(A). On receiving notice from a credit reporting agency that a

consumer disputes the information a furnisher has provided, the furnisher is

required to (1) investigate the veracity of the disputed information; (2) review the

information provided by the credit reporting agency; (3) report the results of the

investigation; and (4) correct any inaccuracies uncovered by the investigation. *Id.*

§ 1681s-2(b)(1)(A)-(D). While a consumer cannot bring a private cause of action

for a violation of a furnisher's duty to report truthful information, a consumer may

recover damages for a willful violation of 15 U.S.C. § 1681s-2(b)(1)(A)-(D).

*Bach*, at 358-359, citing, *Stafford v. Cross Country Bank*, 262 F.Supp.2d 776,

782-83 (W.D. Ky. 2003). Where a furnisher is found to have willfully violated

§ 1681s-2(b)(1), the consumer-plaintiff may recover "actual damages sustained by

the consumer as a result of the failure or damages of not less than $100 and not

more than $1,000." 15 U.S.C. § 1681n(a)(1)(A).

In order to recover actual damages, a plaintiff must show that the violation

of the statute caused the loss of credit or some other harm. *Bach*, at 360-361,

citing, *Crabill v. Trans Union*, *LLC*, 259 F.3d 662, 664 (7th Cir. 2001). Such

evidence can include rejected applications for credit. *Id*. at 361. In addition, actual

damages for a FCRA violation may include humiliation and mental distress. *Bach*,

at 361, citing, *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995). An injured person's testimony alone may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements. *Id*. at 361, citing, *United States v. Balistrieri*, 981 F.2d 916, 931-32 (7th Cir. 1992).

The FCRA itself does not mandate the level of investigation a furnisher of information is required to undertake under section 1681s-2(b). Courts have construed the statute as requiring furnishers to conduct a reasonable investigation. *Ferrarrelli v. Federated Financial Corp. of America*, 2009 WL 116972, *5 (S.D. Ohio 2009), citing, *Miller v. Wells Fargo & Co.*, 2008 WL 793676, *5 (W.D. Ky. 2008), *Westra v. Credit Controls of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005); *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004) (collecting cases). Whether a furnisher has acted reasonably in discharging its § 1681 s-2(b) duties is generally a question of fact for the jury. *See Westra*, 409 F.3d at 827; *see also Gamby v. Equifax Information Services, LLC*, 2010 WL 46946, *2 (E.D. Mich. 2010). Some courts have held that the "determination of the 'reasonableness' of the defendant's procedures ... is treated as a factual question even when the underlying facts are undisputed. It therefore cannot be resolved on summary judgment unless the reasonable or unreasonableness of the

procedures is beyond question ... ." *Murphy v. Midland Credit Management, Inc.*, 456 F.Supp.2d 1082 (E.D. Mo. 2006), citing, *Crabill v. Trans Union, LLC*, 259 F.3d 662, 664 (7th Cir. 2001).

Plaintiff claims that all defendants violated the FCRA by failing to conduct a reasonable reinvestigation into plaintiff's consumer disputes. Brighton Market has filed a cross-motion for summary judgment in its favor on this claim. Riley has opposed plaintiff's motion. Using an agency theory under the FCRA, plaintiff asserts that Brighton Market is equally responsible for Riley's willful failure to conduct a reasonable reinvestigation into plaintiff's dispute.

Plaintiff urges the Court to conclude that Riley's investigation was unreasonable as a matter of law because Riley was able to verify that all of the information on the checks, except the payee names of Tony Haddad, was bogus. (Dkt. 30-11, pp. 75-77). Riley revealed at his deposition that at the time that he placed the trade lines on plaintiff's consumer credit file, he had no idea whether plaintiff was the person who passed these bad checks. (Dkt. 30-11, pp. 84, 95). In connection with his reinvestigation, Riley merely "perused his file" related to the Blue Diamond check and the Brighton Market check and compared the two checks. (Dkt. 30-11, pp. 76, 104-105). The files contained plaintiff's home address in Macomb, Michigan because Riley had used the White Pages to find the home address of a "Tony Haddad." (Dkt. 30-11, p. 97). Riley was unable to explain,

however, how he selected this particular Tony Haddad as the one who may have passed the two bad checks. Moreover, the addresses that were associated with the bogus Tony Haddad were never connected by Riley to plaintiff. Notably, Riley did not have plaintiff's social security number until he received the consumer dispute form from Experian related to plaintiff's consumer dispute. (Dkt. 30-11, p. 153). Thus, he had no basis for comparison of any social security number in his file. Even then, Riley misinformed Experian that the social security number that Experian had for plaintiff matched the one in his records (Dkt. 30-13), even though they had no such number for plaintiff. According to plaintiff, Riley did nothing more than review material that he already knew contained no information linking the plaintiff to either of the checks (Dkt. 30-11, p. 110) and lied to Experian about having the same social security number in its files as Experian had. (Dkt. 30-11, p. 153-154; 30-13).

According to Riley, he received four such written dispute notices two from "Tony Haddad" and two from "Tony M. Haddad, Sr." At his deposition, plaintiff denied ever using the "Tony M. Haddad, Sr." alias, but, according to Riley, it is clear that he did so, given that he is the only person who could have initiated these credit disputes. According to Riley, the consumer dispute notices themselves create a question of fact. That is, according to Riley, if plaintiff lied to Experian, what is to say he did not lie in all of his other representations?

The undersigned suggests that there is no genuine issue of material fact as to whether Riley conducted a reasonable investigation after receiving notice from a credit reporting agency of plaintiff's dispute and that plaintiff is entitled to judgment as a matter of law. The undersigned suggests that the reinvestigation "procedure" used by Riley was objectively unreasonable as a matter of law. At a minimum, a reasonable reinvestigation includes a verification of the date of birth, address, and social security number of the debtor. *See Westra*, and *Gamby*, *supra*. In the view of the undersigned, Riley essentially plucked this particular "Tony Haddad" off the internet and decided that he must be the one who passed the two bad checks.[3] Then, when faced with a dispute, Riley did nothing to verify that plaintiff was actually the Tony Haddad who passed the bad checks and further, falsely informed Experian that he had a basis in fact (other than the information received *from* Experian) to confirm plaintiff's social security number, when he clearly did not. The undersigned suggests that summary judgment in plaintiff's favor and against Riley is appropriate.

According to Brighton Market, it cannot be liable for any breach of the

---

[3] The undersigned notes that a search of the name "Tony Haddad" in the State of Michigan on the White Pages website reveals seven entries (two are duplicates with the same address), only one of whom has plaintiff's middle initial of "M", which is *not* used on the bogus checks. Of course, there is no evidence to suggest that any or all of these additional entries existed at the time Riley conducted his on-line search for "Tony Haddad," however the undersigned suggests that the probability of five persons with the name "Tony Haddad" moving to Michigan since May, 2009 is very low.

FCRA because it did not "furnish" any information to Experian, which is required to trigger any reinvestigation obligations under § 1681s-2(b). Jeff Farida (an owner of Brighton Market) testified that he had no knowledge of the reporting or the dispute. Brighton Market also points out that Riley testified that he did not inform Brighton Market of the dispute. (Dkt. 55, Riley at 221-223; Dkt. 37, Ex. 3). Haddad testified that he had no knowledge whatsoever of Riley's actions or knowledge of the dispute. (Dkt. 54, Haddad at 44, 46, 53, 56, 90). Thus, Brighton Market argues that, since knowledge of a creditor's dispute is essential to trigger the duty to conduct an investigation, Brighton Market cannot be held accountable. However, Mr. Riley also testified at his deposition that he did, in fact, notify Brighton Market of the dispute. (Dkt. 30-11, p. 16). Based on the contract between Riley and Brighton Market, Riley was authorized to make reports to consumer reporting agencies on behalf of Brighton Market and Riley claims that he had a directive to provide information to Experian. (Dkt. 30-11, p. 14).

The real issue presented is whether and to what extent Brighton Market may be held liable for the actions of Riley. Brighton Market argues that plaintiff inappropriately relies on *Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961 (6th Cir. 1997) for the proposition that a defendant, as a principal, can be vicariously liable for the acts of his agent (here, Riley) under the FCRA. In *Jones*, the issue was whether the employer could be vicariously liable for the acts of its

rogue employee, even though it did not authorize or condone it. The Sixth Circuit

concluded that the employer could be held responsible under common law agency

theories. Brighton Market urges the Court to conclude that the *Jones* case, which

involved an entirely different section of the FCRA (15 U.S.C. § 1681o, which

applies to users of credit information), should not be extended to furnishers under §

1681s-2(b). According to Brighton Market, plaintiff's reliance on *Jones* is

inappropriate because Riley is a classic independent contractor and the deterrence

value of allowing vicarious liability applicable to employer-employee relationships

cited in *Jones* simply does not apply here.

　　In the view of the undersigned, the holding in *Jones* cannot be so narrowly

construed in light of the FCRA's underlying deterrent purpose and its strong policy

of consumer protection. Other courts have concluded as such. *Ellis v.

Pennsylvania Higher Education Assistance Agency*, 2008 WL 4351746, *3 (C.D.

Cal. 2008) (The "reasoning supporting a vicarious liability theory does not seem

limited to § 1681b."). This is also evidenced in the *Jones* decision where the court

identified three theories of vicarious liability that may apply under the FCRA.

*Jones*, 144 F.3d at 965 (discussing express authorization, respondeat superior, and

apparent authority). First, "a principal may be vicariously liable for an agent's

tortious conduct if the principal expressly or implicitly authorized the conduct."

*Id.*, citing, *In re Atlantic Fin. Mgmt. Inc.*, 784 F.2d 29, 31 (1st Cir. 1986). Second,

"a principal [may also be] held liable for torts committed by an agent when the agent acts for the benefit of his principal in the scope of his employment." *Id*. Third, "a principal may be vicariously liable for an agent's tortious conduct ... if the principal ... held the agent out to third parties as possessing sufficient authority to commit the particular act in question and there was reliance on the apparent authority." *Id.*, citing, Restatement (Second) Agency § 8, p. 30 (1958). Not all of these theories rely on a employer-employee relationship, thus, Brighton Market's narrow reading of *Jones* is unwarranted.

Moreover, Riley's mere status as an "independent contractor" is not dispositive of this issue. *Edwards v. Toys R Us*, 527 F.Supp.2d 1197, 1213 (C.D. Cal. 2007) (Rejecting argument by the defendant that there was no material issue of fact regarding agency of "independent contractor" because this status alone does not conclusively establish that independent contractor was not the defendant's agent.). The *Edwards* court relied in part on *Jones* in reaching its conclusion and noted a line of cases holding that an agency relationship may be established despite the agent's status as an independent contractor. *Edwards*, 527 F.Supp.2d at 1213, citing, *Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 998 (9th Cir. 1997) ("But an independent contractor, no less than a servant may be an agent in that he is employed as a fiduciary, acting for the principal with the principal's consent and subject to the principal's overall control and direction in accomplishing some

matter undertaken on the principal's behalf," citing Restatement (Second) of Agency § 14); Restatement (Second) of Agency § 1, cmt. (e) ("An agent may be one for whose physical acts the employer is not responsible and who is called an independent contractor in order to distinguish him from a servant"); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) (holding, in the FLSA context, that independent contractor status is not dispositive and that "determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity."). The undersigned does not suggest that Riley is, in fact, an agent of Brighton Market. Rather, the undersigned suggests that whether and to what degree Brighton Market may be liable for Riley's actions is a question of fact for a jury to decide. *Ellis*, at *5 (Where the defendant primarily distinguished the facts on the degree of the principal-agent relationship, the court considered this to be an issue for trial.).

The undersigned suggests that Brighton Market's assertion that plaintiff is not entitled to attorney fees because he has not proven actual damages should be saved for another day. After the questions of fact are sorted out by a jury, who will determine whether and to what extent plaintiff suffered damages, the issue of attorney fees can appropriately be addressed.

## IV. RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS** that plaintiff's

motion for summary judgment against the Riley defendants be **GRANTED IN PART** and **DENIED IN PART**, and that the cross motions for summary judgment submitted by plaintiff and Brighton Market against each other be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

|                        | s/Michael Hluchaniuk            |
|------------------------|---------------------------------|
| Date:  April 12, 2010  | Michael Hluchaniuk              |
|                        | United States Magistrate Judge  |

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 12, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Gary D. Nitzkin, Robert A. Kuhr, and Gordon S. Gold</u> .

s/Tammy Hallwood
Case Manager
U.S. District Court
600 Church Street
Flint, MI 48502
(810) 341-7887
tammy_hallwood@mied.uscourts.gov